IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A SAMSUNG CELL PHONE, BLACK IN COLOR, WHICH WAS FOUND IN THE POSSESSION OF EDGAR EDUARDO QUIROZ-OTERO AND SEIZED BY LAW ENFORCEMENT ON MAY 20, 2022.  THE DEVICE IS CURRENTLY LOCATED AT HOMELAND SECURITY INVESTIGATIONS FORENSIC LABORATORY | Case No. 2:22-mj-382 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Homeland Security Investigations (HSI) Special Agent (SA) Clark S. Powers (your affiant), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

Your affiant submits this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one black Samsung cell phone—which is currently in law enforcement possession, and the extraction from the cellular telephone of electronically stored information described in Attachment B.

1.     Your affiant has been employed by HSI since December 2016, having been assigned to our Sells, Arizona office.  During that time, your affiant was assigned to the Sells Border Enforcement and Security Task Force (BEST), which focused on human, narcotics, bulk cash, and weapon smuggling occurring between Ports of Entry (POE) and the Phoenix, Arizona metropolitan area.  Beginning in October 2020, your affiant was assigned to the HSI Columbus, Ohio office, as a participating member of the Central Ohio High Intensity Drug Trafficking Area (HIDTA) multi-agency task force.   Your affiant gained experience through a Bachelor of Arts

Degree in Criminal Justice in 2007, completion of the Federal Criminal Investigator Training Program (CITP) and completion of the HSI Special Agent Training Academy in 2017. During CITP and the HSI Academy training, your affiant was instructed in all phases of criminal investigation such as: Criminal Law, Search and Seizure, Field Enforcement Techniques, Firearms Proficiency, and Interviewing and Evidence. Your affiant is responsible for enforcing federal criminal statutes including, but not limited to, controlled substance violations, pursuant to 21 U.S.C. §§ 841 and 846.

2.      Through both training and experience, your affiant is familiar with narcotics traffickers' methods of operation including the importation, distribution, and transportation of illegal drugs, the collection of money, and money laundering. Your affiant has executed, or participated in the execution of, numerous search warrants and seized evidence of these violations.

3.      Your affiant has experience in conducting criminal investigations of violations of Title 21 (controlled substance statutes) and Title 19 (customs statutes) of the United States Code. Based on your affiant's experience, training, and conversations with HSI Special Agents, DEA Special Agents, United States Postal Inspectors, and HSI Task Force Officers, your affiant has observed and learned that narcotics trafficking organizations utilize several methods to insulate their illegal activities from law enforcement detection. These methods are common to major narcotics trafficking organizations and vary in levels of sophistication.

4.      Through training and experience, your affiant knows drug trafficking organizations commonly use electronic devices, cellular telephones, and radio telephones in an attempt to maintain secure communications between network members and customers. They use these devices during the commission of their criminal activity and the events preceding and following such activity for the following reasons:

a) They use cellular telephones to arrange, coordinate, and monitor smuggling activities including communicating with other smugglers, arrangers, and other transporters/drivers to coordinate narcotics loads. They also use cellular telephones to communicate with these same individuals during counter-surveillance activities, and to warn co-conspirators of the presence of law enforcement or other obstacles to their smuggling plans.

b) They use cellular telephones to contact financial institutions where they launder their proceeds or receive monies for payment for their roles in the scheme, as well as to contact individuals who sell/rent real estate, vehicles, or other facilities the smuggler uses to conduct illegal activities.

c) They use all the communication technologies available within the particular cellular telephone, including voice messaging, texting, audio communications, direct dial, push-to-talk, email, internet access, communication applications, encrypted communications, photo and video images, and contact lists containing information about their criminal associates to accomplish their illicit activities.

d) They use multiple cellular telephones and often change cellular telephones to avoid detection by law enforcement.

5. Your affiant is investigating an organized group of individuals, some known and unknown currently, including **Edgar Eduardo QUIROZ-Otero (hereafter referred to as QUIROZ-OTERO)**. The organization is suspected of conspiring to distribute and possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846.

6. The facts in this affidavit are based upon your affiant's personal observations, training and experience, and information obtained from other agents and witnesses. This

3

affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all your affiant's knowledge about this matter.

7.     Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 21 U.S.C. §§ 846 (conspiracy to distribute and possess with intent to distribute more than 400 grams of fentanyl) has been committed by **QUIROZ-OTERO**. There is also probable cause to believe evidence relating to the above criminal violation under investigation, including the users of the cellular telephone and information about both known and unknown co-conspirators, will be stored on, or tied to the cellular telephone. There is probable cause to believe that the use of the investigative technique described by the warrant will result in investigators learning this information.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.     The property to be searched is a Samsung cellphone, black in color, which was found in the possession of **Edgar Eduardo QUIROZ-OTERO** and seized by law enforcement on May 20, 2022. The device (hereafter referred to as **"Target Phone"**) is currently located at the HSI Columbus Forensic Laboratory.

9.     The applied-for warrant would authorize the forensic examination of **Target Phone** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

10.    Based upon your affiant's training, experience, investigative trends, and conversations with other Special Agents and law enforcement officers, it is common for drug trafficking organizations (DTO) to utilize short-term rental properties, hotels, and mailbox stores to facilitate the trafficking of illegal narcotics and contraband. These methods minimize the DTO's residence from being

compromised during the investigation and give the appearance of a legitimate parcel consignee address.

11.     On May 20, 2022, HSI Special Agents (SA's) and Task Force Officers (TFO's) assigned to the Central Ohio High Intensity Drug Trafficking Area (HIDTA) Task Force reviewed source information for short-term rentals in the Columbus, OH area.   HSI SA's and TFO's discovered Edgar Eduardo QUIROZ-OTERO (hereafter referred to as QUIROZ-OTERO), phone number (702) 210-2105 was listed as the current renter of short-term rental property at 84 Meek Ave., Columbus, OH.  In March 2022, the Central Ohio HIDTA Task Force investigated several DTO members who used the same address, 84 Meek Ave., and the investigation led the Task Force to seize several kilograms of fentanyl, heroin, and methamphetamine, which the DTO shipped via parcel delivery company next day air service.

12.     HSI SA's and TFO's then searched law enforcement databases for subscriber information for the aforementioned phone number and found it was registered to Jose Montoya Soto, 2900 El Camino Ave., Apt. 41, Las Vegas, NV.  SA's and TFO's attempted to find listings for QUIROZ-OTERO or Soto at 2900 El Camino Ave. but found no records that anyone with either name ever lived at the El Camino Ave. address.  In your Affiant's training and experience, DTO members will often use fictitious names and addresses for cell phone subscriber information to avoid law enforcement detection.  In addition, past Central Ohio HIDTA investigations have revealed that DTO's frequently distribute narcotics from the Las Vegas, NV area to the Columbus, OH area.

13.     With the above information, HSI SA's and TFO's established surveillance in the area of 84 Meek Ave.  At approximately 6:47 a.m. local time, HSI SA's and TFO's observed a United Parcel Service (UPS) van drive down Meek Ave. and park just south of 84 Meek Ave.  Several minutes later, a UPS driver delivered the cardboard parcel box to the front porch of 84 Meek Ave.

At approximately 6:51 a.m., SA's and TFO's observed a white Nissan Versa bearing Ohio temporary tag O004516 (hereafter referred to as Target Vehicle) parked at the 84 Meek Ave. residence. A Hispanic male, later identified as QUIROZ-OTERO, was sitting in the driver's seat, then exited Target Vehicle, walked to the front porch of 84 Meek Ave., retrieved the parcel and entered the residence. HSI SA's and TFO's then called for additional law enforcement officers to respond to the area of 84 Meek Ave., and the responding officers included an Ohio State Highway Patrol (OSHP) Trooper and K-9 handler.

14.     At 7:34 a.m., QUIROZ-OTERO exited 84 Meek Ave. with a medium sized roller bag, which he placed in the trunk of Target Vehicle. QUIROZ-OTERO then got into Target Vehicle and departed the area. HSI SA's and TFO's, including OSHP Troopers, followed to conduct mobile surveillance. At approximately 7:44 a.m., an OSHP Trooper stopped QUIROZ-OTERO in Target Vehicle near McKinley Ave. and N. Souder Ave. after the Trooper observed several moving traffic violations. OSHP Trooper Michael Rucker approached Target Vehicle, asked for QUIROZ-OTERO's identification, then placed QUIROZ-OTERO in the back of the Trooper's OSHP cruiser. OSHP Trooper Rucker utilized his K-9 partner to conduct an open-air sniff of the Target Vehicle. The K-9 alerted to an odor he is trained to detect emanating from the trunk of the Target Vehicle. At approximately 7:55 a.m., OSHP Trooper Rucker found two kilograms of suspected fentanyl in the roller bag located in the trunk of Target Vehicle, which later field tested presumptive positive for fentanyl. Edgar Eduardo QUIROZ-OTERO was in possession of a Black Samsung Cell Phone, **Target Phone,** at the time of the stop.

15.     HSI SA's and TFO's seized the fentanyl and **Target Phone,** advised QUIROZ-OTERO of his Miranda rights, and placed him under arrest. SA's and TFO's transported QUIROZ-OTERO to the Columbus Division of Police Headquarters, located at 120 Marconi Boulevard, Columbus,

OH, for additional questioning. Your affiant, along with Columbus Police Department (CPD) Detective Kevin George interviewed QUIROZ-OTERO. HSI New York SA Jose Maldonado is a native Spanish speaker and provided translation for the custodial interview. Investigators reminded QUIROZ-OTERO of his Miranda rights, which he again waived, agreeing to speak with investigators at that time. During the interview, QUIROZ-OTERO admitted he knew the package he retrieved from the porch of 84 Meek Ave. contained drugs. QUIROZ-OTERO stated he would be paid for successful delivery of the parcel. QUIROZ-OTERO did not know the specific payment amount he would receive but expressed that he knew it was "good money." QUIROZ-OTERO provided investigators with the phone number for **Target Phone** during the course of their questioning.

16. HIDTA TFO's later obtained a search warrant for 84 Meek Ave. and executed it at 12:03 p.m. During the search, investigators found a cardboard parcel box bearing a UPS shipping label from Antonio Toriz Santamaria, (702) 210-2127, 3600 N. Pecos Rd., Las Vegas, NV, to Aiden Eden Cortez Munoz, 84 Meek Ave., Columbus, OH. Inside the house, SA's and TFO's found an additional one kilogram of suspected narcotics, which later tested presumptive positive for cocaine, and bulk U.S. currency.

17. **Target Phone** is currently in the custody of HSI Columbus, which is within the Southern District of Ohio.

18. Probable cause exists to believe that **Target Phone** may contain evidence identifying: (1) cellular telephone numbers used by drug trafficking associates; (2) telephone calls conducted with drug trafficking co-conspirators (including time, date, and duration of calls); (3) photographs of and/or with drug trafficking co-conspirators, illegal controlled substances, and/or currency; (4) text and/or voicemail message communications (including time and date) with drug trafficking

7

associates; (5) electronic mail and social media internet sites accessed by the users of the devices; (6) usernames and/or passwords utilized by the users of the devices to access electronic mail and social media internet sites; and (7) addresses, locations, and locations frequented by **Target Phone**.

19.     Based on your affiant's training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, your affiant knows that drug trafficking organizations utilize cellular telephones (such as **Target Phone**) to communicate when conducting their illegal activity, utilizing the voice, text, and electronic mail (if accessible) functions of the cellular telephone to do so.  These devices are utilized in furtherance of the crime by coordinating the transport and distribution of controlled substances, the tracking of narcotics laden mail parcels, the collection and movement of currency, as well as communicating with members of the drug trafficking organization about the specific operations of that organization.

20.     Further, based on your affiant's training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, your affiant knows that individual members of drug trafficking organizations often carry and utilize more than one cell phone per person at a time.  It is common practice for these individuals to use different phones or various phone applications to communicate with different members of the drug organization. This helps insulate individuals from being linked to the greater conspiracy if one member is caught by law enforcement.  Additionally, when communicating with drug trafficking organizations based in Mexico, it is common to see phones or SIM cards that are solely used to communicate with the individuals in Mexico, and phones or SIM cards solely used to communicate with individuals in the United States.

## TECHNICAL TERMS

21.     Based on training and experience, your affiant uses the following technical terms to convey the following meanings:

      a.  Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

      b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras

also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

22.     Based on your affiant's training, experience, and research, your affiant knows that **Target Phone** has capabilities that allows it to serve as a wireless telephone, digital camera, and GPS navigation device. In your affiant's training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23.     Based on knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time. Similarly, items that have been viewed via the

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

24. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Target Phone** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **Target Phone** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on

the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of **Target Phone** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27.    Your affiant submits that this affidavit establishes probable cause for a search warrant authorizing the examination of **Target Phone** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Clark S. Powers
Special Agent
Homeland Security Investigations

12

Subscribed and sworn to before me
on May 31, 2022:



Elizabeth A. Preston Deavers
United States Magistrate Judge

**ATTACHMENT A**

The property to be searched includes the device identified in the Affidavit as:

a)   A Black Samsung Smart Phone (hereafter referred to as "**Target Phone")**, found
in the possession of Edgar Eduardo QUIROZ-OTERO, and seized by law
enforcement on May 20, 2022.  **Target Phone** is currently located at the HSI
Columbus, Ohio computer forensics room.

This warrant authorizes the forensic examination of **Target Phone** for the purpose of
identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.    All records on the device described in Attachment A that relate to violations of 21 U.S.C. §§ 846 and 841(A)(1)(vi) and involve Edgar Eduardo QUIROZ-OTERO including:

    a.  Any contact made either by call, text message, email, or third party application between any of the seized devices or other parties currently unknown to law enforcement at this time. Third party applications may include (but are not limited to):

        i.  KIK Messaging App

        ii.  BlackBerry Messenger (BBM)

        iii.  What's APP

        iv.  Signal

        v.  Tango

        vi.  Facebook Messenger

        vii.  Group Me

        viii.  Voxer Messenger

        ix.  Yahoo Messenger

        x.  Google Maps and other Mapping applications

    b.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.  Any information related to sources or distributions of drugs (including names, addresses, phone numbers, pictures, or any other identifying information);

    d.  Any information recording Edgar Eduardo QUIROZ-OTERO's schedule or travel;

      e.   All bank records, checks, credit card bills, account information, and other financial records that may reveal evidence of drug and/or money laundering; and

      f.   Evidence of user attribution showing who used or owned each device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

    2.   As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.